## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

JEROME ADRIAN DAVID,

        **Plaintiff,**

v.                                      **Case No. 23-CV-405-RAW-JAR**

DUSTIN HODGES, et al.,

        **Defendants.**

### OPINION AND ORDER

Plaintiff, a state prisoner appearing pro se and proceeding *in forma pauperis*, brings this action under 42 U.S.C. § 1983, alleging violations of his constitutional rights. Dkt. No. 19. Having conducted a review of Plaintiff's Amended Complaint [Dkt. No. 19], the Court determines this action should be dismissed without prejudice pursuant to 28 U.S.C. § 1915A, 28 U.S.C. § 1915(e)(2)(B)(ii), and 42 U.S.C. § 1997e(c)(1), for failure to state a claim upon which relief may be granted.

    I.    BACKGROUND

Plaintiff initiated this action on November 30, 2023, by filing a Pro Se Prisoner Civil Rights Complaint. Dkt. No. 1. On preliminary review, the Court determined Plaintiff's Complaint was deficient in several respects and directed Plaintiff to amend his pleading. Dkt. No. 8. The Court admonished Plaintiff that, pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, Plaintiff's amended complaint must include "a short and plain statement of when and how each named defendant violated [his] constitutional rights." *Id.* at 3. The Court further admonished Plaintiff that he must allege each defendant's personal participation in the violation of his constitutional rights and that "simply alleging that a defendant is an employee [of a governmental entity] or supervisor" is inadequate to state a claim. *Id.*

Plaintiff submitted his Amended Complaint on August 28, 2024. Dkt. No. 19. The pleading spans 149 pages, names over thirty-five defendants, and alleges multiple unrelated claims

involving five different facilities. Where, as here, a plaintiff asserts unrelate sets of claims against unrelated groups of defendants, the Court ordinarily would dismiss the improperly joined parties or sever the unrelated claims under Rule 21 of the Federal Rules of Civil Procedure. In this case, however, dismissal based on misjoinder may prejudice Plaintiff, as most or all of his claims likely would be barred by the statute of limitations if raised in a new action, *see Nasious v. City & Cnty. of Denver*, 415 F. App'x 877, 880-81 (10th Cir. 2011), and severance is unnecessary, as Plaintiff's claims may be dismissed in the instant action for failure to state a claim upon which relief may be granted.

On November 18, 2024, Plaintiff filed a motion to supplement his Amended Complaint to add new claims against new defendants.[1] Dkt. No. 22. The Court denies this motion. "Supplemental pleadings are . . . appropriate to 'set forth new facts in order to update [an] earlier pleading.'" *Carter v. Bigelow*, 787 F.3d 1269, 1278 (10th Cir. 2015) (quoting 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1504 (3d ed. 2014)). Plaintiff's proposed supplement does not update his Amended Complaint but, rather, presents unrelated claims against new defendants. As such, supplementation would run afoul of the Federal Rules of Civil Procedure governing joinder of claims and parties[2] and would permit Plaintiff to improperly circumvent fee obligations applicable to new actions. *See* Fed. R. Civ. P. 18-21.

II.    LEGAL STANDARD

The Court is obligated to conduct a review of a complaint filed by a prisoner seeking "redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). If the complaint is frivolous, malicious, fails to state a claim upon which relief may

---

[1] Plaintiff also filed a motion on September 12, 2024, seeking leave to "supplement address information" "for the purpose of summons and service." Dkt. No. 20. In light of the Court's finding that Plaintiff's Amended Complaint fails to state a plausible claim for relief, Plaintiff's motion is denied as moot.

[2] Unlike the claims asserted in the Amended Complaint, the claims asserted in Plaintiff's proposed supplement would not be barred by the statute of limitations if raised in a new action. Accordingly, the denial of the motion to supplement does not prejudice Plaintiff.

be granted, or seeks monetary relief from a defendant who is immune from such relief, the Court must dismiss the complaint. *Id.* § 1915A(b). Similarly, the Court may dismiss an action "at any time" under these same grounds if the plaintiff is proceeding *in forma pauperis*. *Id.* § 1915(e)(2)(B); *see also* 42 U.S.C. § 1997e(c)(1) (governing prisoners' § 1983 actions challenging prison conditions and requiring dismissal "if the court is satisfied" that any of these grounds exist).

The Court may sua sponte dismiss a pro se complaint for failure to state a claim upon which relief may be granted where it is "patently obvious" that the plaintiff cannot prevail on the facts alleged and "allowing him an opportunity to amend his complaint would be futile." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (internal quotation marks omitted). To avoid dismissal, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]he tenant that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In the context of § 1983 cases, where defendants "often include the government agency and a number of government actors sued in their individual capacities," it is "particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008) (emphases in original). While the Court construes a pro se litigant's pleadings liberally, this liberal construction, "does not relieve the plaintiff of the burden of alleging sufficient facts on

3

which a recognized legal claim could be based." *Hall*, 935 F.2d at 1110. The Court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1175 (10th Cir. 1997).

III.    DISCUSSION

Plaintiff divides his pleading into six categories of claims: (1) retaliation, (2) interference with legal mail, (3) deliberate indifference to Plaintiff's exposure to second-hand smoke, (4) deliberate indifference to unsanitary eating conditions, (5) racial discrimination, and (6) insufficient law library access. The Court addresses each in turn.

a.    Plaintiff's Retaliation Claims

To succeed on a retaliation claim, a plaintiff must show "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). "[T]emporal proximity between the protected [activity] and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014); *cf. Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (finding retaliatory motive had been sufficiently pled where the plaintiff plausibly alleged not only close temporal proximity between the filing of a grievance and the plaintiff's transfer to an out-of-state supermax prison, but also that "Defendants were aware of his [grievance], [and] that his [grievance] complained of Defendants' actions").

Plaintiff's numerous retaliation claims are predicated on either Plaintiff's submission of prison grievances or his pursuit of a federal lawsuit in the U.S. District Court for the Western District of Oklahoma, Case No. CIV-21-534-SLP (the "Western District lawsuit"). The filing of lawsuits and prison grievances qualify as constitutionally protected activities under Tenth Circuit precedent. *See Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir. 1996) ("[P]rison officials may

4

not harass or retaliate against an inmate for exercising his right of access to the courts."); *Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018) ("The filing of prison grievances is constitutionally protected activity."); *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007) ("[A] private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress."). Accordingly, the Court finds Plaintiff has plausibly alleged that he was engaged in constitutionally protected activity as to each of his retaliation claims. The Court finds, however, that Plaintiff has failed to plausibly allege one or both of the remaining elements.

*i. Alleged Retaliation at Howard McLeod Correctional Center ("HMCC")*

1. Rose LNU and Derrick Russell

Plaintiff alleges that, while housed at HMCC, "kitchen staff member Rose (LNU) and kitchen supervisor Derrick Russell fired Plaintiff from his job of working in the kitchen for pursuing [the Western District lawsuit] against Scott Crow et al" and "for filing grievances against mailroom supervisor Chelsea Catlett and other prison officials." Dkt. No. 19, at 18. He contends that on or around July 25, 2021, he asked Rose LNU and Russell if he could take time off from his kitchen job to work on an amended complaint for his Western District lawsuit. *Id.* Plaintiff alleges Rose LNU and Russell's "attitude immediately changed and became angry towards [him]" when they learned that the lawsuit was against Scott Crow, "their boss." *Id.* at 19. He then alleges that he filed his amended complaint on August 9, 2021, and that on August 23, 2021, when he "attempted to check in for work in the kitchen," Rose LNU fired him and Russell "confirmed or approved [the] termination." *Id.*

In support, Plaintiff points to a Request to Staff attached to his pleading in which he asks Russell why he was fired. Dkt. No. 19-1, at 18-19. The document, however, provides no inference of a retaliatory motive. Rather, it suggests Plaintiff was fired for not providing the proper documentation for his absence from work. *See id.* at 18 (staff member response that Plaintiff was

given time off but "no documentation was ever received").[3]  Indeed, the dates Plaintiff supplies suggest he did not attempt to return to work for two weeks after his legal deadline had passed.  *See* Dkt. No. 19, at 19.  Plaintiff does not suggest that he named either Rose LNU or Russell as a defendant in his Western District lawsuit or otherwise provide sufficient facts demonstrating their decision to fire Plaintiff was, as Plaintiff suggests, a retaliatory act for suing "their boss." Plaintiff's allegation that Rose LNU and Russell became angry when they learned he was suing Scott Crow is insufficient to elevate his theory from speculative to plausible.

Plaintiff also attached to his pleading a Request to Staff, dated July 6, 2021, addressed to Chelsea Catlett.  Dkt. No. 19-1, at 15-16.  In it, Plaintiff accuses Catlett of being rude to him when Plaintiff sought to make copies of his legal mail.  Plaintiff, however, does not allege that either Rose LNU or Russell was aware of this grievance submission or explain why they would be motivated to retaliate in response to a grievance wholly unrelated to them.  The grievance appears both temporally and contextually unconnected to his firing, and Plaintiff fails to provide any facts from which the Court could infer that Rose LNU or Russell's decision to fire Plaintiff from his kitchen job was substantially motivate by the submission of this grievance.

### 2.  Warden Dean Clayton

Plaintiff additionally alleges that HMCC Warden Dean Clayton retaliated against Plaintiff for filing grievances and pursing the Western District lawsuit.  Dkt. No. 19, at 20.  He states that he submitted grievances in January and February 2022 and filed a motion for injunctive relief in the Western District lawsuit on February 22, 2022, and that Clayton transferred Plaintiff to Jackie Brannon Correctional Center ("JBCC") on May 1, 2022, in retaliation.  The allegation that these events occurred within a few months of each other is insufficient to permit an inference of a

---

[3] The Court "may look both to the complaint itself and to any documents attached as exhibits to the complaint" when determining whether Plaintiff has stated a claim on which relief may be granted.  *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *see Hall*, 935 F.2d at 1112 ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.").

retaliatory motive. *Trant*, 754 F.3d at 1170. Plaintiff does not provide facts suggesting that Clayton was aware of the grievances or motion for injunctive relief prior to Plaintiff's transfer or that the protected activities "complained of [Clayton's] actions." *Gee*, 627 F.3d at 1189. Plaintiff's speculative and conclusory allegations cannot support a claim for relief.

### ii.    Alleged Retaliation at JBCC

Plaintiff avers he was retaliated against by multiple officers at JBCC "for filing a Request to Staff/grievance and for pursuing [the Western District lawsuit] against Scott Crow et al." Dkt. No. 19, at 21.

### 1.    Scott LNU and Bill Loud

Plaintiff first contends that on or around July 14, 2022, his supervisor, "Scott (LNU)," permitted Plaintiff to take time off from his job at the butcher shop to "complete several legal procedures" by their Court-ordered deadlines. *Id.* at 22. Plaintiff alleges that, on July 19, 2022, he "attempted to notify Scott of another deadline" but Scott LNU advised him that he was "fired from the butcher shop for missing days." *Id.* Plaintiff then states that Scott LNU "notified his supervisor, Bill Loud of Plaintiff['s] absences from work to conduct . . . legal procedures" and asserts that "Loud could be held liable because he approved or ordered for Scott (LNU) to terminate Plaintiff from the butcher shop for conducting . . . a First Amendment protected right to petition the Court for redress of grievance(s)." *Id.* Plaintiff attached to his pleading a Request to Staff regarding the incident, in which he states he was wrongfully terminated but provides no additional details. Dkt. No. 19-1, at 23.

Neither Plaintiff's allegations nor the attached Request to Staff provide sufficient facts from which the Court could reasonably infer that Plaintiff's termination was predicated on a retaliatory motive. Plaintiff does not allege that Scott LNU and Loud were named defendants in his Western District lawsuit or otherwise explain why Plaintiff's pursuit of the legal action would motivate retaliation from individuals unconnected to the lawsuit. Further, while Plaintiff alleges Scott LNU agreed to Plaintiff's request for time off, he does not specifically allege the length of

time agreed to or provide facts indicating his absences between July 14 and July 19, 2022, were all excused. Because Plaintiff's supposition of retaliation lacks factual support, his allegations are insufficient to support claims for relief.

### 2. Dustin Hodges and His Supervisors

Plaintiff next alleges that Dustin Hodges issued Plaintiff "a false class X-25 misconduct . . . out of retaliation, after [Plaintiff] verbally stated to him 'I am going to write you up for racial discrimination.'"[4] Dkt. No. 19, at 23. Plaintiff also claims Officer B. Brown, Warden Jim Farris, and Deputy Warden Margaret Green are liable under a theory of supervisory liability for permitting the retaliation to occur. *Id.* at 24-26.

Plaintiff attached to his Amended Complaint documents pertinent to this incident, including Dustin Hodges's Incident/Staff Report, and the subsequent Disciplinary Hearing Report. In the former document, Hodges described the incident as follows:

> On the above date and approx. time Inmate David, Jerome . . . came to property to acquire a towel. In informed [him] that he is not issued a state towel if he had a towel in his personal property. I Hodges, Dustin pulled his property file . . . [and the] file reflects he has a personal towel. I Hodges, Dustin then informed inmate David, Jerome . . . that I am not issuing him a towel because he has a towel in his personal property. Inmate David, Jerome . . . became belligerent and said I Hodges, Dustin was racist and [that] he was going to file paperwork and have other inmates file paperwork on me Hodges, Dustin. At this time I sent Inmate David, Jerome . . . back to JBCC B-Unit. Lieutenant notified.

Dkt. No. 19-1, at 24. The Disciplinary Hearing Report reflects that Plaintiff was found guilty of the incident. *Id.* at 25. In additional documents attached to the Amended Complaint, Plaintiff admits that he had a personal towel in his possession, *id.* at 26, 29, that Hodges advised Plaintiff that inmates with personal towels were not issued additional towels, *id*. at 30, and that Plaintiff then verbally threatened Hodges with a grievance claiming racial discrimination, *id.* at 28, 30.

---

[4] The Court assumes, for purposes of this claim, that Plaintiff has alleged engagement in a constitutionally protected activity. *See* Dkt. No. 19-1, at 28 (stating he "wrote a Request to Staff about the discrimination").

The Tenth Circuit has held that prisoners "cannot state a retaliation claim . . . based on [a] disciplinary report" where, as here, "the prison hearing officer found [the prisoner] committed the acts alleged in the report." *Requena*, 893 F.3d at 1211. The officer overseeing Plaintiff's disciplinary hearing found Plaintiff guilty of the offence based upon Hodges's statement, and Plaintiff's pleading exhibits supply additional evidence supporting his guilt. Accordingly, Plaintiff's retaliation claim based upon the allegedly false disciplinary report fails. *See Lopez v. Roark*, 637 F. App'x 520, 521 (10th Cir. 2016) ("[I]f a prisoner is found guilty of an actual disciplinary infraction after being afforded due process and there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction." (emphasis and internal quotation marks omitted)).

Further, because Plaintiff failed to allege an underlying constitutional violation, his supervisory liability claims against Officer B. Brown, Warden Jim Farris, and Deputy Warden Margaret Green likewise fail. *See Doe v. Woodard*, 912 F.3d 1278, 1290 (10th Cir. 2019) ("Supervisors cannot be liable under § 1983 where there is no underlying violation of a constitutional right by a supervisee.").

### 3. Joanna Boettler

Plaintiff claims Joanna Boettler "issu[ed] a false class-A misconduct [report]" against Plaintiff to "increase Plaintiff['s] points for transfer to a higher security, more dangerous prison." Dkt. No. 19, at 27-28. He claims this act was in retaliation for Plaintiff's submission of "a grievance about racial discrimination against Dustin Hodges" and a Request to Staff regarding inmates smoking in his unit. *Id.* at 28 (citing Dkt. No. 19-1, at 31). Plaintiff provides no facts, however, supporting his assertion that the disciplinary report was false, such that the report might constitute an adverse action.

Further, Plaintiff provides insufficient allegations of retaliatory motive. Plaintiff claims that he complained to Boettler on May 10, 2022, regarding Hodges's allegedly discriminatory refusal to provide him with a state-issued towel and that Boettler responded by threatening to

9

transfer Plaintiff for accusing a prison officer of racism. *See id.* This event, however, is too attenuated from Boettler's November 4, 2022, misconduct report to support Plaintiff's speculative assertion that the latter was substantially motivated as a response to Plaintiff's grievance submission against Hodges. Additionally, Plaintiff provides no facts, other than temporal proximity, to suggest Plaintiff's October 31, 2022, Request to Staff regarding smoking motivated Boettler to retaliate with the misconduct report. *See id.* The Request to Staff does not complain of any action taken by Boettler, and Plaintiff does not explain why the grievance would motivate Boettler to retaliate. *See Gee*, 627 F.3d at 1189. Plaintiff therefore has failed to allege sufficient facts to support a plausible claim for relief against Joanna Boettler.

### 4. Jim Farris

Plaintiff claims JBCC Warden Jim Farris retaliated against Plaintiff for his grievances against prison staff by placing Plaintiff on "grievance restriction in order to cause obstruction to Plaintiff['s] exhaustion efforts." Dkt. No. 19, at 29. Plaintiff attached to his Amended Complaint a letter from Farris placing Plaintiff on grievance restriction for a twelve-month period "based on the repeated submissions of grievances or 'Requests to Staff' about issues previously addressed by staff in written response." Dkt. No. 19-1, at 38 (emphasis omitted). Plaintiff provides no facts supporting his assertion that the grievance restriction was "wrongful" or that Farris was motivated by retaliation. Without more, Plaintiff's allegation of retaliation is conclusory and speculative.

Plaintiff also states Farris retaliated against him by permitting Joanna Boettler and B. Brown to write false misconducts against Plaintiff and approving Plaintiff's transfer to a higher security prison. Dkt. No. 19, at 30. Plaintiff, however, does not elaborate on these accusations. His implication that Farris personally participated in these actions, through supervisory liability or otherwise, therefore lacks sufficient factual support to be plausible.

### 5. Angela Cacey

Plaintiff next alleges that he received two "false" class-A misconducts on November 4, 2022. Dkt. No. 19, at 31. He contends that, as a result of the two misconducts, his assigned case

manager, Angela Cacey, "classified Plaintiff as a high risk inmate, boosted [his] points to medium security and recommended for Plaintiff to be transferred to a more dangerous higher security prison and demoted Plaintiff from level 4 to level 1." *Id.* Plaintiff contends that Cacey knew the misconducts were false, but acted on them nonetheless. *Id.* He claims Cacey acted in retaliation for an October 31, 2022, Request to Staff in which he accused Cacey of racial discrimination. *Id.* (citing Dkt. No. 19-1, at 39).

Plaintiff again has not plausibly alleged a retaliatory motive. He does not allege Cacey was aware of the Request to Staff against her. *Cf. Gee*, 627 F.3d at 1189. The document was addressed to Perry Boettler and does not contain a response. Dkt. No. 19-1, at 39. Nor does Plaintiff provide any support for his conclusory assertion that the two misconducts were false or that Cacey knew them to be false. Plaintiff's speculative accusations cannot support a plausible claim for relief.

### 6.  B. Brown

Plaintiff claims JBCC case manager B. Brown wrote a "false class-A misconduct" against Plaintiff in retaliation for Plaintiff's submission of grievances against the "B-Unit team and staff members" and his pursuant to the Western District lawsuit, which involved "B-Unit harmful conditions." Dkt. No. 19, at 32. Plaintiff does not allege that Brown was personally named in the Western District lawsuit or grievances regarding the B-Unit team. Nor does he plausibly allege Brown was aware of Plaintiff's lawsuit or grievances. Plaintiff alleges they "made [Brown's] job more difficult," but he provides no facts in support, let alone sufficient facts to support an inference that the class-A misconduct was substantially motivated by Plaintiff's protected activities. *Id.*

### 7.  Lieutenants Fisk and Riley

Next, Plaintiff alleges "JBCC B-Unit night shift sergeant or lieutenant Fisk (FNU) retaliated against [him] by deliberately failing to properly assess an emergency situation because Plaintiff filed a grievance and made complaints about B-Unit night shift officers." *Id.* at 34. He contends that on November 3, 2022, he was "approached by several inmates and threatened to be

11

attacked" because of Plaintiff's grievance complaining of inmate smoking. *Id.* Plaintiff alleges, "[A]n officer . . . [saw] and heard the commotion and was in fear . . . and told [Plaintiff] to follow him outside of B-Unit. [Plaintiff] followed him to B-Unit staff's office where Sgt. or Lt. Fisk was watching baseball on the computer[;] therefore, Sgt. or Lt. Fisk ignored the threat and danger against Plaintiff that was going on [i]n B-Unit." *Id.* at 35. Nothing in Plaintiff's allegations suggests Fisk was aware of the alleged event at the time it occurred or aware that Plaintiff was in any danger. He therefore has not plausibly alleged an adverse action substantially motived by retaliation.

Plaintiff additionally accuses Fisk of "not gather[ing] any information" or writing a report of the incident. *Id.* Plaintiff similarly claims that he discussed the inmates' threats with Lieutenant Riley, but that Riley failed to "conduct [a] proper investigation of the incident." *Id.* at 36-37. Plaintiff attests this failure was in retaliation for Plaintiff's Request to Staff regarding B-Unit night shift commanders allowing inmate smoking. *Id.* at 36. Without more, however, the Court cannot reasonably infer that the alleged failure to investigate or write a report caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in his lawsuit and grievances. *See Shero*, 510 F.3d at 1203. Even if this were not so, Plaintiff provides insufficient facts of a retaliatory motive. Plaintiff does not plausibly allege that Fisk or Riley was aware of the Request to Staff, or that either was personally named in it. And while Plaintiff states that Fisk was aware of his Western District lawsuit and that it "probably caused investigations on B-Unit," he provides no facts supporting these statements or suggesting that Fisk or Riley was personally named in the lawsuit or otherwise personally affected. Dkt. No. 19, at 34.

### 8.   Chief of Security W. Bershears

Plaintiff alleges JBCC Chief of Security W. Bershears reviewed camera footage of the November 3, 2022, incident, yet "did not report" the names of the inmates involved to Joanna Boettler, Angela Cacey, and B. Brown. Dkt. No. 19, at 38-39. Plaintiff claims Bershears withheld the information as retaliation for an October 31, 2022, Request to Staff accusing Bershears of

failing to provide a healthy living environment. *Id.* at 38.

To state a retaliation claim, Plaintiff must plausibly allege that the defendant engaged in an adverse action. Here, Plaintiff's allegations suggest Bershears was the "incident commander" responsible for "assess[ing]" the November 3, 2022, incident. *Id.* Plaintiff does not allege that Bershears, as incident commander, was required to provide the names of the inmates to Boettler, Cacey, or Brown, or suggest that those individuals specifically asked Bershears for the information. The allegations simply do not permit a plausible inference that Bershears inflicted an adverse action of the type contemplated for a retaliation claim. Nor does Plaintiff plausibly allege a retaliatory motive, as he provides no facts suggesting Bershears was aware of the October 31, 2022, Request to Staff purportedly motivating Bershears's conduct. The document was addressed to, and disposed of by, Perry Boettler, with no indication that Bershears was informed. Dkt. No. 19-1, at 31.

### 9. Mona Allen Weeden

Next, Plaintiff alleges JBCC law library supervisor Mona Allen Weeden retaliated against him for submitting a Request to Staff in March 2022, accusing Weeden of denying him access to the law library. Dkt. No. 19, at 40. Plaintiff claims that, in retaliation, Weeden restricted Plaintiff's law library hours in May 2022. *Id.* Plaintiff cites a May 2022 Request to Staff attached to his pleading. This document, however, reflects that Plaintiff was seeking more time than permitted under prison policy to prepare legal documents for which the Court had not set deadlines. Dkt. No. 19-2, at 1-2. The Request to Staff also reflects that, in response to the request, Weeden advised Plaintiff of the policy. Plaintiff provides no facts plausibly alleging Weeden's response was in error, let alone intentionally retaliatory. Plaintiff therefore has not plausibly alleged an adverse action or retaliatory motive.

Plaintiff also claims Weeden did not allow Plaintiff to "mail out a legal publication through the legal mail" in July 2022. Dkt. No. 19, at 40. In the pertinent Request to Staff, Plaintiff states Weeden "told [him] that [he] needed to first mail or fax the order [regarding service by publication]

to Oklahoma City to get it verified by the legal advisors for the Department of Corrections befor[e] [Weeden] could allow [Plaintiff] to mail out any legal court documents." Dkt. No. 19-2, at 3-4. Plaintiff provides no allegations suggesting Weeden's alleged response was contrary to prison policy or that her actions were substantially motivated as a response to Plaintiff's prior grievance submissions.

### iii.  Alleged Retaliation at North Fork Correctional Center

Plaintiff next claims officials at the North Fork Correction Center ("NFCC") retaliated against him for filing grievances.

### 1.  Jenny Payne

Plaintiff claims he submitted a Request to Staff to law library supervisor Jenny Payne on November 15, 2022, and that Payne retaliated by "intentionally" sending two of Plaintiff's JBCC misconduct appeals to the wrong location and by denying his requests for a notary, "indigent legal disbursement forms," and additional time in the law library. Dkt. No. 19, at 41. Neither Plaintiff's allegations nor the Requests to Staff Plaintiff attached to his pleading regarding the alleged acts plausibly suggest Payne's actions were substantially motivate as retaliation for the November 15, 2022, Request to Staff. Plaintiff's November 15, 2022, Request to Staff was not a grievance against Payne, complaining of her actions. *Cf. Gee*, 627 F.3d at 1189. Rather, it was a request directed to Payne, seeking legal forms. *See* Dkt. No. 19-2, at 5-6. Plaintiff does not explain why such a document would motivate retaliatory action. Further, the Requests to Staff Plaintiff attached regarding Payne's alleged retaliatory actions do not provide "*specific facts* showing retaliation because of the exercise of [Plaintiff's] constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (internal quotation marks omitted); *see* Dkt. No. 19-2, at 7-10.

### 2.  C. Calderon

Plaintiff next asserts that, in retaliation for "fil[ing] a grievance against her friend/peer[] law library supervisor Jenny Payne" NFCC mailroom supervisor C. Calderon "arbitrarily and in bad faith did not mail out [two of Plaintiff's JBCC] grievances" and reopened his outgoing legal

14

mail. Dkt. No. 19, at 42-43. Plaintiff's assertion that he submitted a grievance against Calderon's friend is insufficient to support an inference that Calderon acted with a retaliatory motive. Further, Plaintiff attached to his pleading Requests to Staff directed to Calderon, addressing her alleged failure to mail the two JBCC grievances and the opening of Plaintiff's legal mail. Dkt. No. 19-2, at 11-14. These documents reflect that Calderon advised Plaintiff that, pursuant to prison policy, Plaintiff was only allowed two "free/indigent letters to mail out a week" and that Plaintiff had already met that limit. *Id.* at 11-12. Calderon further advised Plaintiff that prison policy required prisoners to "send all legal mail unsealed." *Id.* at 13. Plaintiff provides no facts refuting that Calderon acted in accordance with prison policy. Accordingly, Plaintiff has not plausibly alleged an adverse action or a retaliatory motive.

### 3. Ashley Allen

Plaintiff alleges Ashley Allen retaliated against him for filing grievances. Dkt. No. 19, at 44-45. Plaintiff, however, provides no facts regarding the grievances. As such, the Court cannot infer that they complained of Allen's conduct or that she was aware of their existence. Further, Plaintiff alleges Allen retaliated by providing him a copy of two JBCC misconduct appeals one or two days after their receipt, instead of the day of receipt. *Id.*; *see* Dkt. No. 19-2, at 15-19. This allegation is insufficient to support an inference that Allen's actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in his protected activity. Thus, Plaintiff's speculative and conclusory retaliation claim against Allen likewise fails to meet the plausibility standard.

### 4. C. Cox

In his next claim of retaliation, Plaintiff alleges he submitted a grievance against C. Cox and that Cox retaliated by failing to promote Plaintiff to "level 2." Dkt. No. 19, at 46. Plaintiff does not provide sufficient details, however, regarding the desired promotion to support an inference that he suffered an injury severe enough to deter an individual from engaging in protected activity. Nor does Plaintiff allege Cox was aware of the grievance Plaintiff submitted against him

or provide any facts from which the Court could reasonably infer a retaliatory motive.  *See* Dkt. No. 19-2, at 20.

### 5.  Brittany Hamlett

Plaintiff alleges that he submitted a grievance against Brittany Hamlett in April 2023 for her failure to promote Plaintiff to "level two" when he became eligible.  Dkt. No. 19, at 47. Plaintiff alleges Hamlett retaliated against him in August 2023 by declining to "lower or reduce Plaintiff['s] security points to minimum security level when he qualified."  *Id.* at 47-48; *see* Dkt. No. 19-2, at 23-25.  Plaintiff does not allege, however, that Hamlett was aware of the April 2023 grievance, and the grievance was not temporally proximate to the alleged retaliatory conduct.  The Court cannot reasonably infer from Plaintiff's allegations or supporting materials that Hamlett acted with a retaliatory motive.

### iv.  *Additional Allegations of Retaliation*

### 1.  Leon Wilson

Plaintiff contends that Leon Wilson, who is "over . . . offender banking," transferred "100% of Plaintiff['s] monthly gang pay funds into his savings account balance instead of only 20%, to prevent Plaintiff from drawing commissary."  Dkt. No. 19, at 49.  Plaintiff contends this act was in retaliation for Plaintiff's pursuit of the Western District lawsuit.  *Id.*  Plaintiff does not allege that Wilson was named in the Western District lawsuit or otherwise provide facts connecting Wilson with that lawsuit.  Plaintiff's suggestion that Wilson acted in retaliation is wholly conclusory and is not entitled to an assumption of truth.

### 2.  Dustie Haney

Finally, Plaintiff claims Oklahoma Department of Corrections legal counsel Dustie Haney retaliated against Plaintiff for pursing the Western District lawsuit.  *Id.* at 50.  Plaintiff claims Haney "instructed law library supervisor Mona Allen Weeden to improperly withhold [his] outgoing legal mail and not provide [him] copies of his outgoing legal mail."  *Id.*  Plaintiff also claims Haney "withheld summons from [the] Oklahoma Attorney General's Office."  *Id.*  Plaintiff,

however, does not articulate why Haney would be motivated to retaliate in response to a lawsuit in which he was not a named defendant. Further, the documents Plaintiff attached to his pleading in support of this claim reflect that Haney and Weeden acted in accordance with their interpretation of prison policy, and Plaintiff does not provide facts suggesting their interpretation was in error. Dkt. No. 19-2, at 27-28. Nor do the attached documents support Plaintiff's assertion that Haney intentionally withheld a summons. *See* Dkt. No. 19-2, at 29. As such, Plaintiff fails to provide facts supporting an inference that Haney acted in retaliation for Plaintiff's pursuit of the Western District lawsuit.

*v. Conclusion*

In sum, Plaintiff's speculative accusations of retaliation are insufficient to support a claim for relief. "An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of [his] constitutional rights." *Peterson*, 149 F.3d at 1144 (internal quotation marks omitted). A prisoner's "pursu[it] [of] a plethora of prison grievances and lawsuits over the years . . . alone does not establish the requisite causal connection for his retaliation claim[s]." *Strope v. Commings*, 381 F. App'x 878, 883 (10th Cir. 2010). "If it did, litigious prisoners could claim retaliation over every perceived slight . . . simply by pointing to their litigiousness." *Id.*; *see Peterson*, 149 F.3d at 1144 ("Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity."); *Iqbal*, 556 U.S. at 678-79 (explaining that a complaint "stops short of the line between possibility and plausibility of entitlement to relief" where the alleged facts "are merely consistent with a defendant's liability" or where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" (internal quotation marks omitted)).

b.   <u>Plaintiff's Claims of Interference with Legal Mail</u>

Plaintiff next claims that his legal mail was tampered with at JBCC, NFCC, and Great Plains Correctional Center ("GPCC"). Dkt. No. 19, at 58-63. Interference with a prisoner's legal

17

mail may implicate the prisoner's constitutional right to access to the courts. *Simkins v. Bruce*, 406 F.3d 1239, 1243 (10th Cir. 2005). To state a claim for relief, the prisoner must plausibly allege that the interference "resulted in 'actual injury' by 'frustrating,' 'impeding,' or 'hindering his efforts to pursue a legal claim.'" *Id.* (alterations omitted) (quoting *Lewis v. Casey*, 518 U.S. 343, 351-53 & n.3 (1996)). Cognizable harm arises "when a claim is lost or rejected on account of the defendant's misconduct" or "when the plaintiff's efforts to pursue a claim are impeded." *Id.* at 1244. The prisoner "need not show" that the claim would have prevailed absent the interference, but to demonstrate cognizable harm, he must demonstrate "that [the claim] was not frivolous." *Id.*

Plaintiff alleges that, while housed at JBCC, "several exhibits [were] removed from [his] outgoing legal mail [and] court documents were not mailed to the courts." Dkt. No. 19, at 58. He contends a motion for extension of time in his Western District lawsuit "never made it to the Court" and that prison authorities opened and removed exhibits from the envelope containing his second amended complaint for the Western District lawsuit. *Id.* at 59. Plaintiff names JBCC's warden, deputy warden, law library supervisor, and chief administrator in relation to this claim, but he provides no facts plausibly alleging their personal participation in the alleged misconduct. *See Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."); *Robbins*, 519 F.3d at 1250 (explaining that in the context of § 1983 cases, it is "particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her"); *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (explaining that supervisory liability requires "an 'affirmative link' between the supervisor and the constitutional violation" (internal quotation marks omitted)). Further, Plaintiff provides no facts regarding the effect of the alleged misconduct on his ability to pursue his legal claims. Accordingly, Plaintiff has not plausibly alleged the requisite "actual injury."

Plaintiff next alleges that, while housed at NFCC, mailroom supervisor C. Calderon "willfully, intentionally and with malice repeatedly reopened Plaintiff['s] outgoing legal mail

without plaintiff being present and caused delays and late filings of/with Plaintiff's court documents and grievance appeals." Dkt. No. 19, at 61. He claims that, while housed at GPCC, Calderon "continued to reopen Plaintiff['s] outgoing legal mail without Plaintiff being present, reading the contents therein and returning legal mail to sender (Plaintiff) reopened, instead of mailing the legal mail to the Courts." *Id.* He further claims NFCC's warden Rick Whitten "allowed and permitted" noncompliance with prison mail policies. *Id.* These allegations likewise fail to plausibly allege a constitutional violation. Plaintiff provides no facts regarding any actual injury to his legal claims or suggestion that his legal claims were nonfrivolous, and Plaintiff's general allegations of misconduct against Calderon and Whitten are insufficient to "nudge[] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. As previously noted, a Request to Staff attached to Plaintiff's pleading indicates Calderon was acting in accordance with prison policy, and Plaintiff provides no facts to suggest otherwise. Dkt. No. 19-2, at 11-14; *see supra* Section III.a.iii.2.

### c. Plaintiff's Claims of Deliberate Indifference to Plaintiff's Exposure to Second-Hand Smoke

Plaintiff alleges that he was exposed to "dangerous and extremely high levels" of "second hand tobacco and drug(s) smoke" from March 2022 to November 2022 at JBCC and that he experienced shortness of breath as a result. Dkt. No. 19, at 64. While it is unclear whether Plaintiff is seeking to bring a claim of deliberate indifference to a serious medical need or a claim of inhuman conditions of confinement, the Court finds the claim fails under either theory. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The deliberate indifference standard is appropriate "[w]hether one characterizes the treatment received by the prisoner as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (alteration and internal quotation marks omitted). The standard "is satisfied if the official 'knows of and disregards an excessive risk to inmate health

or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (alteration omitted) (quoting *Farmer*, 511 U.S. at 837).

Plaintiff claims JBCC Chief of Security W. Bershears, correctional officer Francis, night shift sergeant Fisk, case manager Angela Cacey, night shift supervisor Lieutenant Riley, B-Unit manager Joanna Boettler, and JBCC Warden Jim Farris "knew or [were] aware of the inmate(s) who were smoking inside the buildings" and allowed it to continue by failing to enforce JBCC's non-smoking policies. Dkt. No. 19, at 64-66. Plaintiff complained of the smoking in an October 2022 Request to Staff. Dkt. No. 19-1, at 31. In response, Boettler advised Plaintiff that JBCC is a non-smoking facility and that there is "not much that can be done" unless prison officials "catch the individual inmate actually smoking." *Id.*

Plaintiff's allegations lack sufficient facts to plausibly suggest the defendants acted with deliberate indifference. "Mere imperfect enforcement of a policy does not amount to deliberate indifference." *Beard v. Patton*, No. 15-CV-0163-JED-PJC, 2016 WL 616379, at *5 (N.D. Okla. Feb. 16, 2016) ("Mere knowledge that some inmates at some time were violating the ODOC no-smoking policy is not enough to satisfy the deliberate indifference standard. . . . Plaintiff's allegations of generally ineffective enforcement of the policy are insufficient to establish an affirmative link between Defendants and the alleged constitutional violations."); *see Brown v. Head*, 190 F. App'x 808, 810 (11th Cir. 2006) ("The lack of enforcement of the existing smoking policy at best shows mere negligence and is insufficient to demonstrate deliberate indifference."). Plaintiff does not allege specific facts demonstrating that these defendants were aware of the degree or duration to which Plaintiff was exposed to second-hand smoke or that they drew the inference that the level of smoke posed a significant risk of substantial harm to Plaintiff during the time period alleged.

Plaintiff additionally claims that Oklahoma Department of Corrections Director Steven Harpe, Chief of Staff Justin Farris, and Chief Administrator of Institutions Jim Farris have "failed

to act or appoint correctional officers that will take action or enforce the non-smoking policies within the prison institutions." Dkt. No. 19, at 66. Plaintiff's assertion that these individuals were aware of the alleged violation of policy, however, is conclusory and insufficient to demonstrate deliberate indifference. *See Iqbal*, 556 U.S. at 678-79 (explaining that conclusory allegations, without sufficiently pleaded supporting facts, are insufficient to state a claim).

d. <u>Plaintiff's Claims of Deliberate Indifference to Unsanitary Eating Conditions</u>

Plaintiff next alleges unsanitary conditions in JBCC's food storage and food service areas. He states, "While housed at [JBCC,] kitchen supervisor(s) Tammie Brakensiek and Ashley (LNU) have been operating the kitchen at the JBCC in conditions that put Plaintiff['s] health and safety at serious risk. . . . In March of 2022 JBCC kitchen supervisor(s) Tammie Brakensiek and Ashley (LNU) were aware of . . . leaks in the roof and the risk of harm but ignored those risk(s) and continued to serve and store food in the kitchen for over six (6) months under unsanitary conditions. . . . [Their] failure to get [the] roof fixed and other structures of the kitchen repaired caused an infestation of rats in the kitchen, water leaks, and other damages [leading] to unsanitary conditions." Dkt No. 19, at 67; *see* Dkt. No. 19-2, at 35-38.

A prison official "may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. The Court cannot reasonably infer from Plaintiff's allegations that the two kitchen supervisors acted with deliberate indifference. Plaintiff alleges the supervisors failed to fix the leaks in the roof, but he provides no facts from which the Court could infer that the supervisors were personally responsible for fixing roof leaks, that they failed to report the leaks to prison officials responsible for facilitating such repairs, or that they delayed or impeded the repair process. *See Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (explaining that a supervisor's personal involvement in a constitutional violation must be established by demonstrating his "personal participation, his exercise of control or direction, or his failure to supervise" (internal

21

quotation marks omitted)).  Further, Plaintiff fails to provide factual details explaining how the kitchen supervisors' storage methods were deficient or unreasonable under the alleged circumstances. *Books v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) ("An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement.").[5]

Plaintiff separately alleges that Carrie Bridges, Warden of James Crabtree Correctional Center ("JCCC"), "failed to fix structures at the dining hall where inmate(s) ate, that led to unsanitary conditions at JCCC." Dkt. No. 19, at 67.  Plaintiff's allegation, however, is conclusory and does not support an inference of deliberate indifference.  Plaintiff attached to his Amended Complaint a Request to Staff addressed to Bridges in which he advises her of a "mice/rat infestation." Dkt. No. 19-2, at 39-40.  He does not allege, however, that Bridges was aware of the unsanitary conditions prior to his Request to Staff or that she failed to take reasonable measures to abate it once aware.  To the contrary, the disposition portion of the Request to Staff reflects that Bridges scheduled an exterminator in response. *Id.* at 39 ("An exterminator has been scheduled."); *see Clinton v. Security Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (explaining that courts need not accept as true "allegations plainly contradicted by properly considered documents or exhibits").

### e. Plaintiff's Claims of Racial Discrimination

Plaintiff, who is African American, states that he was discriminated against due to his race at both JBCC and GPCC.  The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

---

[5] The material contained in the pertinent administrative grievances attached to Plaintiff's pleading suggests that a correctional officer failed to replace bread he knew to be contaminated from rats, but the grievances do not suggest that either Brakensiek or Ashley LNU was aware of this.  To the contrary, the grievances suggest the kitchen supervisors threw away food they knew to be contaminated. *See* Dkt. No. 19-2, at 38 (noting two occasions in which inmates "[were] not able to get milk for breakfast because kitchen staff Ashley said rats had gotten into the bladders of milk").

U.S. Const. amend. XIV. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Individuals are "similarly situated" only if they are alike "in all relevant respects." *Coal. for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). "An equal protection claim may challenge legislation or the conduct of individual state actors." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021). A plaintiff "'who alleges [such] an equal protection violation has the burden of proving the existence of purposeful discrimination' causing an adverse effect." *Id.* (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)). To state a race-based equal protection claim, a plaintiff must sufficiently allege that he was treated differently from others similarly situated and that "defendants were motivated by racial animus." *Requena*, 893 F.3d at 1210 (quoting *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989)).

Plaintiff alleges that he was discriminated against at GPCC by "property officer Kathy (LNU)." Dkt. No. 19-1, at 7. Plaintiff alleges she "provided similarly situated inmate(s) sheets and towels but would not or did not provide Plaintiff any sheets [or] towels." *Id.* Plaintiff provides no facts, however, supporting an inference that the property officer acted with racial animus or that the other inmates were, in fact, similarly situated to Plaintiff.

Plaintiff then asserts that he "was never provided or issued a state issued bath [or] face towel upon arrival at the JBCC by property officer Dustin Hodges, like other similarly situated inmates of the white and Indian race." *Id.* at 6. Plaintiff admits that he arrived at JBCC with a personal face towel, but he sought a state-issued towel because his was "old, torn, worn out and mildewed." *Id.* Plaintiff alleges that "Dustin Hodges provided similarly situated inmate(s) of the white or Indian race state issued face/bath towels two (2) minutes after telling [Plaintiff] . . . there [were] no face/bath towels available at the property room for exchange nor for state issue." *Id.* at 7. The documents attached to Plaintiff's Amended Complaint, however, contradict Plaintiff's conclusory assertion that inmates who were provided towels at JBCC were similarly situated.

Plaintiff's statements in the relevant administrative grievance reflect that the inmate to whom Dustin Hodges issued a towel was a new arrival entitled under prison policy to receive towels upon entry, and there is no suggestion the inmate had a personal towel already in his possession. *Id.* at 30. Conversely, Plaintiff had a personal towel and was not a new arrival when he requested a state-issued towel. Thus, Plaintiff provides no factual basis to support his assertion that inmates receiving towels were "similarly situated" or that Hodges was motivate by racial animus.

Plaintiff next alleges that "Case Manager Angela Cacey and Bill Loud discriminated against Plaintiff" while he was housed at JBCC by "hiring white inmate(s) at the Butchershop to work a better paying job over Plaintiff even though [they] have the same qualifications." *Id.* at 8. Plaintiff, however, does not support his subjective belief that Cacey and Loud were motivated by racial animus with sufficient facts to support a plausible claim for relief. "Mere differences in race do not, by themselves, support an inference of racial animus." *Green v. Corr. Corp. of Am.*, 401 F. App'x 371, 376 (10th Cir. 2010) ("[Plaintiff] offers no evidence to support his claim of racial discrimination other than the assertions that he is African-American, [Defendant] is Caucasian, and that the other prisoner is not African-American.").

Plaintiff also alleges Cacey and Loud discriminated against him by "[a]llowing similarly situated inmate(s) of the white race with a class X misconduct to be eligible to fill out a work center package to receive better paying job(s) and program opportunities; but Plaintiff of the African American race was not allowed to put in a package until class-x misconduct was two (2) years old." *Id.* at 8. In a Request to Staff attached to Plaintiff's Amended Complaint, however, Plaintiff states that, after checking with JBCC administration regarding Plaintiff's request, Cacey advised Plaintiff that "administration at [JBCC] told her [Plaintiff was] not allowed to go to a Vo-Tech or Work Center" due to his class-X misconduct." *Id.* at 39-40. Plaintiff offers only his own subjective belief and Cacey and Loud acted with racial animus rather than in accordance with this administrative directive. *See Requena*, 893 F.3d at 1210 (rejecting claim of racial discrimination where plaintiff alleged prison official "denied his requests for . . . assistance yet had 'no problem'

24

providing his 'black and white friends' the same assistance").

Finally, Plaintiff contends that the allegedly discriminatory acts previously discussed were "performed pursuant to a . . . custom, policy or practice of discrimination maintained by Dustin Hodges, Angela Cacey, Joanna Boettler, Margaret Green, [and] Kim Lynn," and that "Warden Jim Farris, Chief of Staff Justin Farris, Director Designee Mark Knutson had/have a custom, policy or practice of condoning or tacitly authorizing discrimination on the basis of race by unit Classification Committee (Joanna Boettler, Angela Cacey, B. Brown (FNU)) against Plaintiff who are [sic] the African American race." Dkt. No. 19-1, at 5-6. Plaintiff, however, does not elaborate upon these conclusory statements. To the extent Plaintiff is seeking to establish liability under a theory of supervisory liability, he has failed to provide facts supporting the requisite elements of personal involvement, causation, or state of mind. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767-68 (10th Cir. 2013). To the extent Plaintiff is seeking to support official-capacity claims and establish municipal liability, he similarly has failed to provide facts supporting the requisite elements of an official policy or custom, causation, and state of mind. *Id.* at 769-770; *see Watson v. City of Kan. City*, 857 F.2d 690, 695 (10th Cir. 1988).

### f. Plaintiff's Claims of Insufficient Law Library Access

Finally, Plaintiff contends he was denied adequate access to the law library while housed at HMCC and JBCC. Dkt. No. 19-1, at 11-12. Prisoners have a constitutional right to "meaningful, but not total or unlimited, access to the courts." *Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1107 (10th Cir. 2005). To state a claim for denial of access to courts, a prisoner must demonstrate actual injury. *Lewis*, 518 U.S. at 349. The Supreme Court has not established "an abstract, freestanding right to a law library or legal assistance," so "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* at 351. Rather, the inmate must show that alleged shortcomings actually hindered his efforts to pursue a nonfrivolous legal claim. *Id.* Such hindrance might be established, for example, where "a complaint [the inmate] prepared was dismissed for failure to satisfy some

technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known" or where the inmate was "so stymied by inadequacies of the law library that he was unable even to file a complaint." *Id.* Mere conclusory allegations that an inmate has been "unable to pursue pending litigation" because of restricted access to the law library are insufficient to survive dismissal. *Farrell v. Campbell*, 6 F. App'x 830, 832 (10th Cir. 2001) (finding prisoner's "sweeping allegation of actual injury" was too conclusory to state an actual injury); *see Twyman v. Crisp*, 584 F.2d 352, 357 (10th Cir. 1978) ("[R]estricted access to the law library is not per se denial of access to the courts."); *Vreeland v. Schwartz*, 613 F. App'x 679, 683-84 (10th Cir. 2015) (rejecting as speculative prisoner's assertion that prison officials denying him access to recordings had unduly hindered his efforts to pursue postconviction relief).

Plaintiff broadly alleges, "Prison rules and regulations limit access to the typing computer, legal books, legal information/assistance to . . . two (2) hours a week access to the law library; six (6) hours a week to inmate(s) with a rule imposed or court order deadline." Dkt. No. 19-1, at 12. He alleges he has "suffered injury" as a result of these regulations, including injury related to his "state post conviction appeal out of time" in "Case CF-2018-1628." *Id.* at 12-13. Plaintiff does not describe the alleged injury to his state post-conviction efforts or other litigation. Without more, Plaintiff's solitary reference to injury is insufficient to demonstrate that the time restrictions imposed by prison policy hindered Plaintiff's efforts to pursue nonfrivolous legal claims.

IV.    CONCLUSION

For the foregoing reasons, the Court determines Plaintiff's Amended Complaint "do[es] not permit the court to infer more than the mere possibility of misconduct" and it therefore "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678-79 (internal quotation marks omitted).[6] Accordingly, the Court finds the Amended Complaint

---

[6] To the extent Plaintiff has raised a claim for relief against any defendant in his or her official capacity, such a claim is subject to dismissal, as Plaintiff has failed to plausibly allege that a municipal policy or custom caused a violation of his constitutional rights. *See Schneider*, 717 F.3d 769-70.

should be dismissed without prejudice.[7]

**ACCORDINGLY, IT IS HEREBY ORDERED** that

1)  Plaintiff's Amended Complaint [Dkt. No. 19] is **dismissed without prejudice** pursuant to 28 U.S.C. § 1915A, 28 U.S.C. § 1915(e)(2)(B)(ii), and 42 U.S.C. § 1997e(c)(1), for failure to state a claim upon which relief may be granted;

2)  Plaintiff's Motion to Supplement his Amended Complaint [Dkt. No. 22] is **denied**;

3)  Plaintiff's pending motions [Dkt. Nos. 20, 86] are **denied** as moot;

4)  a separate judgment of dismissal shall be entered in this matter.

**IT IS SO ORDERED** this 11th day of September, 2025.

_____
RONALD A. WHITE
UNITED STATES DISTRICT JUDGE

---

[7] Plaintiff previously was advised of the deficiencies in his original pleading and afforded an opportunity to amend.  Dkt. No. 8.  Despite this opportunity, the unusual length of his amended pleading, and the inclusion of multiple documents in support of his claims, Plaintiff failed to present an arguable claim for relief.  Under these circumstances, a second opportunity to amend would be unwarranted and futile.